# UNITED STATES DISTRICT COURT

for the

_____ District of _____

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

)
)
)
)
)
)

Case No.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❏ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises located at 12949 14th Street in Chino, California (the "SUBJECT RESIDENCE"). The SUBJECT RESIDENCE is a single family home, located on the east side of 14th Street and south of Riverside Drive in the city of Chino, California. The SUBJECT RESIDENCE has white siding with white trim. The front door faces west and is located on the west side of the building with a black security door. The garage is detached and located west of the main residence. The numbers 12949 are marked in black lettering on the curb outside the SUBJECT RESIDENCE. The SUBJECT RESIDENCE is surrounded by a privacy fence made from metal and cement. The SUBJECT RESIDENCE to be searched includes (a) all rooms, porches, containers, and safes in the SUBJECT RESIDENCE; (b) the driveway, and any garages, carports, storage spaces, or other outbuildings on the SUBJECT RESIDENCE; and (c) any digital devices found at the SUBJECT RESIDENCE.

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.  The items to be seized are the fruits, instrumentalities, and evidence of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute a controlled substance) namely:

a.  Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

b.  Records, documents, programs, applications, photographs, screenshots, images, or materials relating to conversations relating to the distribution of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

c.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

d.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital

1

devices and which relate to the above-named violations;

   e. Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

   f. Audio recordings, pictures, video recordings, or
still captured images relating to the possession or distribution
drugs and the collection or transfer of the proceeds of the
above-described offenses;

   g. Contents of any calendar or date book;

   h. Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

   i. Any digital device used to facilitate the above-
listed violations (and forensic copies thereof).

   j. With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

    i. evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

2

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

    vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii. records of or information about Internet Protocol addresses used by the device;

    ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as

4

soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

      b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain

notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling

6

outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. During the execution of this search warrant, with respect to FIGUEROA, and any person who is located at the

SUBJECT RESIDENCE during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is a SUBJECT DEVICE or located at the SUBJECT RESIDENCE and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

        7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

### **AFFIDAVIT**

I, Oscar Godoy, being duly sworn, declare and state as follows:

### **I. PURPOSE OF AFFIDAVIT**

6.   This affidavit is made in support of a criminal complaint against SANTIAGO RODRIGUEZ FIGUEROA ("FIGUEROA"), also known as "El Chino" for a violation of Title 21, United States Code Section 841(a)(1) (possession with intent to distribute a controlled substance).

7.   This affidavit is also made in support of an application to search the following:

a.   A single family residence located at 12949 14th Street, Chino, California 91710 ("SUBJECT RESIDENCE"), as further described in Attachment A-1; and

b.   Three digital devices seized from FIGUEROA's person and inside his van on February 20, 2018, currently in the custody of the Federal Bureau of Investigation, namely a black T-Mobile REVVL Plus, a black ZTE Warp N860, and black Apple iPhone, (collectively, the "SUBJECT DEVICES"), as further described in Attachment A-2.

c.   As further described in Attachment B, the requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance), and 21 U.S.C. § 846 (conspiracy to possess with intent to distribute a controlled substance) (the "Subject

1

Offenses"). Attachments A-1, A-2, and B are incorporated herein by reference.

8. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from confidential informants, various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF TASKFORCE OFFICER OSCAR GODOY**

1. I am a Deputy Sheriff for the San Bernardino County Sheriff's Department ("SBSD") serving as a Task Force Officer ("TFO") for the Federal Buerau of Investigations ("FBI") Los Angeles Inland Empire Hybrid Drug Taskforce ("IEHTF"). I have been employed by the SBSD since 2006. I have been assigned to the Gang and Narcotics Division of SBSD since February 2012. I have also been a TFO for the IEHTF since April 2016.

2. The IEHTF consists of experienced drug investigators from the FBI, Drug Enforcement Administration ("DEA"), Homeland Security Investigations, and the SBSD. The IEHTF is focused on investigating drug trafficking in the Southern California area.

3. I have received approximately six months of training at the SBSD Academy in a variety of fields including, but not limited to, drug trafficking, money laundering, undercover

2

operations, electronic and physical surveillance, and handling confidential informants.

4.    I also received training from the California Narcotics Officers Association ("CNOA") dealing with, among other things, transportation and sales of drugs, possession and transportation of drug proceeds, a wiretap investigation course given by the Los Angeles County District Attorney's Office, an Advanced Criminal Interdiction course given by CNOA, and a Clandestine Laboratory Investigations course given by SBSD.  Throughout my career as a SBSD deputy and as an IEHTF TFO, I have participated in drug distribution investigations, and the execution of search and arrest warrants involving drug distribution crimes.

5.    During my training and through the course of my employment as a law enforcement officer, I have utilized a variety of investigative techniques and resources, including, but not limited to, physical and electronic surveillance, use of confidential informants, undercover operations, telephone toll analysis, and use of GPS position location of cell phones.

6.    Through my training, experience, and interaction with other experienced TFOs, members of the SBSD, Special Agents ("SAs") with the FBI and DEA, and other drug investigators, I have become familiar with the methods employed by drug distributors, in particular, and their practices to smuggle, safeguard, transport, and distribute drugs, and to collect and launder drug proceeds.  These methods include the use of debit calling cards, public telephones, wireless communication technology (such as paging devices and cellular telephones),

3

counter-surveillance, and coded or encrypted communications. These methods are used to avoid detection by law enforcement and to circumvent drug trafficking investigations. I know that during the course of their communications, drug distributors routinely use coded language and/or encryption in an effort to elude law enforcement detection and confine their illegal telephonic communications to well-trusted organizational members and other high-level drug traffickers. Unless otherwise specified, the conversations regarding drugs in this affidavit are described in summary and in substance after being translated from coded language based on my training and experience and knowledge of the investigation.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On or about February 12, 2018, a joint FBI and SBSD Confidential Informant ("CI-1") told me that a Mexico-based methamphetamine source, known as Alfaro ("Alfaro"), could supply CI-1 with methamphetamine. On or about February 14, 2018, CI-1 told me that he received a call from a drug distributor known as "Chino," who was affiliated with Alfaro. Law enforcement later identified "Chino" as FIGUEROA, and discovered that FIGUEROA lived at the SUBJECT RESIDENCE.

8.    On or about February 20, 2018, FIGUEROA offered to sell CI-1 approximately 20 pounds of methamphetamine for approximately $1,940 to $2,000 per pound at a restaurant in San Bernardino, California. When FIGUEROA's car was searched at that restaurant, agents found approximately 22.92 pounds of

suspected methamphetamine in FIGUEROA's van.  FIGUEROA admitted, in a post-<u>Miranda</u> interview, that he was selling drugs.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my observations, my review of the case file, and my conversations with law enforcement personnel, witnesses, the confidential informants, and FIGUEROA, I know the following:

### A.   Discussions about a Methamphetamine Transaction with a Confidential Informant

10.   On or about February 12, 2018, a SBSD, FBI, and DEA Confidential Informant, CI-1,[1] told me that a Mexico-based methamphetamine source of supply he knew as "Alfaro" called CI-1 earlier the same day.  Alfaro told CI-1 that Alfaro had methamphetamine at a stash location in the Los Angeles area. Alfaro told CI-1 that Alfaro would have another person contact CI-1 to set up the logistics of a methamphetamine transaction. This call was not monitored by law enforcement or recorded.

11.   On or about February 13, 2018, CI-1 told me that CI-1 received a telephone call from a Mexican telephone number used by an individual known only as "El Durango."  During that call, El Durango told CI-1 that another individual known as "El Chino" ("Chino"), recently received a large quantity of

---

[1] CI-1 has been an informant with the DEA since 2012, SBSD since 2015, and with the FBI since January 2018.  CI-1 has given credible information in the past that has led to the seizure of more than two hundred thousand dollars of drug proceeds, more than 20 kilograms of cocaine and 100 pounds of methamphetamine. CI-1 has no known criminal convictions.  I believe that since 2012, CS-1 has received approximately $269,000 for his work as a CI with the SBSD, FBI and the DEA.  The FBI plans to pay CI-1 for his work on this case.  CI-1 is also currently receiving immigration benefits from the DEA as part of his work as a CI for the DEA.

methamphetamine.  This call was not monitored by law enforcement or recorded.  Chino was later identified as FIGUEROA.

12.  On or about February 14, 2018, CI-1 told me that CI-1 received a telephone call from Chino who was using telephone number (909)490-7557 (the "909 Number").  During their conversation, Chino informed CI-1 that he had "70 on hand and they were good quality."  CI told me he understood this to mean that Chino had 70 pounds of methamphetamine that was good quality.  This call was not monitored or recorded.

**B.   Identification of the SUBJECT RESIDENCE**

13.  On February 14, 2018, the Honorable Raymond Haight, Superior Court Judge for the County of San Bernardino, signed a warrant and order authorizing the release of subscriber information and GPS position location information for the 909 Number.

14.  Electronic surveillance of the 909 Number revealed that the 909 Number's cell phone was located at the SUBJECT RESIDENCE both late at night on February 15, 2018, and early in the morning on February 16, 18, and 19, 2018.

15.  A California Department of Motor Vehicles ("DMV") database inquiry revealed a white 1997 Ford Utility Van, bearing California license plate 7UJZ612 (the "Van") is registered to FIGUEROA at the SUBJECT RESIDENCE.

**C.   The February 20, 2018 Methamphetamine Transaction, Identification of FIGUEROA as Chino, and Discovery of the SUBJECT DEVICES**

16.  On February 20, 2018, at approximately 10:00 a.m., I instructed CI-1 to contact Chino to arrange for the purchase of

6

a small quantity of methamphetamine as a sample, to be followed by a larger methamphetamine transaction.

17. At approximately 11:00 a.m., CI-1 told me that Chino wanted to sell 20 pounds of methamphetamine for $1,900 per pound of methamphetamine. This call was not monitored or recorded.

18. I told CI-1 to arrange for the purchase of 20 pounds of methamphetamine. CI-1 called me a short time later and told me that he called Chino and told Chino that CI-1 could arrange for the purchase of the methamphetamine. CI-1 and Chino had agreed to conduct the transaction in San Bernardino, California. Chino told CI-1 that the price was going to be an extra $40 per pound because Chino was transporting the methamphetamine to San Bernardino. This call was not monitored or recorded.

19. At approximately 11:31 a.m., a law enforcement surveillance team, using the 909 Number's GPS location, saw the Van at the 909 Number's GPS location. Law enforcement then began to follow the Van and determined that the 909 Number's GPS location matched the approximate location of the Van.

20. At approximately 12:10 p.m., CI-1 called Chino. Chino said he was in the Compton, California area and had 23 pounds of methamphetamine. This call was not monitored or recorded.

21. At approximately 12:31 p.m., law enforcement saw FIGUEROA in a Superior Grocers parking lot located at 6955 La Palma Avenue, Buena Park, California next to the Van. Law enforcement saw FIGUEROA talking to the driver of a blue 1999

7

Toyota Sienna, bearing California license plate 7WZU826.[2]
FIGUEROA reached into the passenger side of the blue Toyota
Sienna and retrieved a black plastic bag.  FIGUEROA returned to
the Van and left the area.  FIGUEROA was the sole occupant of
the Van.

22.  At approximately 12:33 p.m., CI-1 told me that
FIGUEROA called CI-1 and told CI-1 that he had the
methamphetamine and was heading to San Bernardino.  FIGUEROA
told CI-1 that he would arrive by 1:00 p.m.  FIGUEROA asked if
CI-1 had a scale because he thought the methamphetamine packages
were too heavy.  This call was not monitored or recorded.

23.  At approximately 1:14 p.m., FIGUEROA went into a
residence and returned outside with a Hispanic male juvenile.
Both FIGUEROA and the juvenile got into the Van.

24.  At approximately 1:35 p.m., FIGUEROA called CI-1 and
stated that he would arrive in San Bernardino in approximately
one hour.  This call was not monitored or recorded.

25.  At approximately 1:40 p.m., CI-1 informed FIGUEROA
that the transaction would occur at the Viva Villa restaurant
located at 1250 South East Street, San Bernardino, California,
92408 (the "Restaurant").  This call was not monitored or
recorded.

26.  At approximately 3:32 p.m., FIGUEROA arrived at the
Restaurant.  Law enforcement conducting surveillance at the

---

[2] A California DMV database inquiry subsequently revealed
the blue Toyota bearing California license plate 7WZU826 was
registered to Francisco Fernando Vasquez Nava.  Law enforcement
is conducting additional investigation into this individual.

Restaurant saw FIGUEROA get out of the Van and use his cellular telephone.

27.   At approximately 3:34 p.m., CI-1 called TFO Juan Aguirre and told him that FIGUEROA had arrived at the Restaurant.  Law enforcement conducting surveillance at the Restaurant saw FIGUEROA and the juvenile enter the Restaurant. According to CI-2, FIGUEROA and the juvenile entered and sat across from CI-2.[3]

28.   According to CI-2, FIGUEROA asked CI-2 if CI-2 was ready.[4]  FIGUEROA told CI-2 that he had 15 packages and that each

_____

[3] CI-2 was pretending to be CI-1's associate since CI-1 was not based locally and was unavailable to be physically present at the transaction.

CI-2 has been an informant with the SBSD since approximately 2002 and the FBI since 2016.  I believe CI-2 was also an informant for the DEA.  While working with SBSD, CI-2 has been responsible for the seizure of more than $1,000,000 of drug proceeds and 400 pounds of cocaine, methamphetamine and heroin combined.  CI-2 recently assisted with a FBI investigation that led to the federal indictment of four individuals and the seizure of 7 kilograms of cocaine and approximately $110,000 of drug proceeds.  CI-2 has convictions for misdemeanor carrying a concealed weapon, misdemeanor reckless driving, misdemeanor spousal battery, misdemeanor driving without a license, misdemeanor DUI, felony DUI, felony transportation of controlled substances, felony possession of a controlled substance for sale, felony possession of a firearm, and Assault with a Deadly Weapon/Not Firearm.  CI-2's most recent conviction was in 2007.

CI-2 is currently working for immigration benefits and financial gain.  CI-2 has been paid over $100,000 as an informant for SBSD and approximately $2,600 for working as an informant for the FBI.  The FBI plans to pay CI-2 for his work on this case.  I do not know what benefits CI-2 has received for working with the DEA or any other law enforcement agencies.

[4] CI-2 was outfitted with audio and video recording equipment.  Law enforcement was listening to the audio feed of the transaction live, and were also conducting physical surveillance.  Law enforcement also debriefed CI-2.  Law enforcement searched CI-2 and CI-2's vehicle for contraband

9

package had 50 grams extra for total of 16 pounds available for sale to CI-2.  FIGUEROA stated that the price per pound of methamphetamine was $1,950 plus an additional $50 per pound transportation fee.

29.  According to CI-2, CI-2 told FIGUEROA that FIGUEROA was supposed to supply 20 pounds of methamphetamine.  FIGUEROA replied that he would supply the remaining methamphetamine the following day.  FIGUEROA told CI-2 that he actually had 23 pounds of methamphetamine with him, however, the remaining methamphetamine was for another customer.  FIGUEROA then gave CI-2 his contact information and told CI-2 to contact him directly for future drug transactions.  The juvenile was sitting next to FIGUEROA during this conversation.

30.  At approximately 3:44 p.m., FIGUEROA, the juvenile, and CI-2 left the Restaurant and started walking towards their respective cars.  CI-2 called TFO Juan Aguirre and told him that FIGUEROA only had 16 pounds of methamphetamine.

31.  At approximately 3:45 p.m., law enforcement approached FIGUEROA as he arrived at the Van and explained in Spanish that FIGUEROA was the subject of a drug investigation.  FIGUEROA initially denied having anything illegal in his possession and gave law enforcement written consent to search the Van in Spanish.  Before investigators started the consent search, without hearing further questioning, FIGUEROA told law

_____

before the methamphetamine transaction and did not find any contraband.

enforcement that there was something illegal in the Van, but he did not know what it was.

32.  Law enforcement searched the Van and found 21 packages wrapped in clear plastic of suspected methamphetamine.  Based on my training and experience, I believe that the white crystalline substance in these packages appears to be methamphetamine.  Law enforcement weighed the packages of suspected methamphetamine and determined that they weighed approximately 22.92 pounds with the packaging.  22.92 pounds is approximately 10,396 grams.

33.  As part of this investigation, SBSD personnel have not conducted a presumptive field test of the substance encountered on February 20, 2018, which, for the reasons indicated above, I believe is a controlled substance.  The reason that the SBSD has not conducted a presumptive test on the suspected drugs in the field relates to the increasing prevalence of fentanyl, fentanyl-related substances, and synthetic opioids.  A field test of the suspected drugs would require opening the package in a non-laboratory environment and potentially exposing law enforcement personnel to its contents.  I know from my training and experience that exposure to fentanyl and synthetic opioids, whether airborne or even on the skin, can cause serious injury or even death.  I also know from my training and experience that only trained personnel, in a laboratory or comparable secure environment, with necessary personal protective equipment, should be conducting such tests if it is possible that a package contains fentanyl or synthetic opioids.  Conducting tests in an

uncontrolled environment, and without proper protective
equipment, poses an undue risk to law enforcement personnel

34.   Law enforcement searched FIGUEROA and found a Mexican
consular identification card with his photo, and discovered one
of the SUBJECT DEVICES on FIGUEROA's person, and two of the
SUBJECT DEVICES in the Van.

**D.    FIGUEROA's Post-Arrest Interview**

35.   After being read his <u>Miranda</u> rights in Spanish,
FIGUEROA indicated that he understood his <u>Miranda</u> rights and
wished to speak with law enforcement.  This interview was
recorded and was conducted in Spanish, the language in which
FIGUEROA was fluent.

36.   During this interview, FIGUEROA told investigators
that this was his first time selling drugs.  FIGUEROA stated he
was selling drugs out of necessity because his mother was ill.
FIGUEROA stated he was contacted by an unknown person who asked
FIGUEROA if he would deliver some packages.  FIGUEROA was
directed to go to the Superior Grocers parking lot located at
6955 La Palma Avenue, Buena Park, California, 90620.  FIGUEROA
claims that he was then told by this unknown person to leave the
Van and leave it unlocked.  Shortly thereafter, FIGUEROA was
told to return to the Van and was told to deliver the packages
to an unknown person in San Bernardino.  Once in San Bernardino,
FIGUEROA was to wait for further instructions.

## V. <u>TRAINING AND EXPERIENCE REGARDING DRUG DISTRIBUTION OFFENSES</u>

37. Based on my training and experience and familiarity
with investigations into drug distribution conducted by other
law enforcement agents, I know the following:

a. The distribution of drugs is a continuing
criminal activity that occurs over months and often years.
Persons who are involved in drug distribution often maintain in
their residences and vehicles: cash, drugs, drug paraphernalia,
and other items of value and/or proceeds of drug transactions,
as well as evidence of financial transactions relating to
obtaining, transferring, secreting, or spending large sums of
money acquired from engaging in drug distribution activities.

b. Drug distributors often maintain books, records,
receipts, notes, ledgers, bank records, money orders, and other
papers relating to the cultivation/manufacture, transportation,
ordering, sale and distribution of illegal drugs.  These
individuals commonly "front" (provide on consignment) drugs and
other controlled substances to their clients and, thus, keep
records or communication concerning monies owed.  The
aforementioned records are often maintained where the drug
distributor has ready access to them, such as the drug
distributor's residence, places of business, vehicles, other
locations from which the drug distributor conducts drug
transactions.  Such records are also often stored on the drug
distributor's cellular phones, smart phones, and other digital
devices.

c. Communications between people buying and selling

drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug distribution to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug distributors often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug distributors often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    It is common for drug distributors to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

f.    Drug distributors often maintain large amounts of United States currency in order to maintain and finance their

ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g.    Drug distributors involved in packaging drugs for distribution often have packing materials on hand, including, cardboard boxes, packing peanuts, plastic wrap, plastic containers, and towels. These items will often be stored in their residences and their vehicles.

h.    Drug distributors often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles or residences in the event of an unexpected opportunity to sell drugs arises.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and

15

security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[5] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

---

[5] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

        e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in

18

digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be

necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or

instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

39.  As discussed herein, based on my training and
experience I believe that digital devices will be found during
the search of the SUBJECT RESIDENCE.  Additionally, I have
already seized the SUBJECT DEVICES.  I believe that some of the
SUBJECT DEVICES, including the black Apple iPhone already
seized, and the digital devices we may seize at the SUBJECT
RESIDENCE, may have a feature that enables their users to unlock
their devices through the biometric features of the user.

a.    I know from my training and experience and my
review of publicly available materials that several hardware and
software manufacturers offer their users the ability to unlock
their devices through biometric features in lieu of a numeric or
alphanumeric passcode or password.  These biometric features
include fingerprint-recognition, face-recognition, iris-
recognition, and retina-recognition.  Some devices offer a
combination of these biometric features and enable the users of
such devices to select which features they would like to
utilize.

b.    If a device is equipped with a fingerprint
scanner, a user may enable the ability to unlock the device
through his or her fingerprints.  For example, Apple Inc.
("Apple") offers a feature on some of its phones and laptops

called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is

22

necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

d.    While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung

Galaxy S8 and Note 8 (discussed above) have iris-recognition features.  In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

40.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

41.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has

24

been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

42. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law

enforcement to have the ability to require FIGUEROA, and any individual who is found at the SUBJECT RESIDENCE and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

43. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to FIGUEROA, and every person who is located at the SUBJECT RESIDENCE during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is a SUBJECT DEVICE or is (a) located at the SUBJECT RESIDENCE and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

44.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

45.   For all the reasons described above, there is probable cause to believe that FIGUEROA has committed a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).  Also, for all the reasons described above, there also probable cause to believe the items listed in Attachment B, are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in a search of the SUBJECT RESIDENCE and on the SUBJECT DEVICES described in Attachments A-1 and A-2.

<br>

_____
Oscar Godoy, Taskforce Officer
Federal Bureau of Investigation

Subscribed to and sworn before me
this _____ day of February, 2018.

<br>

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE